IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. LARAVIE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MIKHAEL J. LARAVIE, APPELLANT.

Filed July 10, 2018.    No. A-17-1214.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Mikhael J. Laravie, age 17 at the time of his charged offenses, appeals from the Lancaster County District Court's order denying his motion to transfer his pending criminal proceeding to the juvenile court. Finding no abuse of discretion, we affirm.

## II. BACKGROUND

An information was filed in the district court charging Laravie with burglary and two counts of possession of a stolen firearm; each of these is a Class IIA felony punishable by up to 20 years' imprisonment. The first count in the information alleges that Laravie did forcibly break and enter real estate with the intent to commit a felony or steal property on July 16, 2017, and the remaining two counts allege that on July 30, Laravie was in possession of stolen firearms.

On September 27, 2017, Laravie filed a motion requesting the district court to waive its jurisdiction to the juvenile court for further proceedings pursuant to Neb. Rev. Stat. § 29-1816

(Supp. 2017). A hearing on Laravie's motion took place on October 24; a summary of the evidence adduced at that hearing follows.

## 1. STATE'S EVIDENCE

The State offered exhibits 1 through 5. These were received without objection for purposes of the transfer hearing. The State did not call any witnesses to testify, but elicited additional evidence through its cross-examination of Laravie's witnesses.

### (a) Exhibit 1

Exhibit 1 includes a March 2015 petition filed against Laravie in the separate juvenile court of Lancaster County for two theft by shoplifting charges, each a Class II misdemeanor punishable by up to 6 months' imprisonment and/or a $1,000 fine. One incident occurred in October 2014 and the other in March 2015, for items taken from stores without payment which had a value of less than $200. An April adjudication order reflects that Laravie pled no contest to the March offense, and the State dismissed the other charge. Following a dispositional hearing on June 29, an agreement and order of probation was entered, and it set forth numerous terms and conditions for Laravie's probationary period of 6 months. A supplemental petition was filed within the case in October for criminal mischief ($500-$1,500), a Class II misdemeanor. It claimed Laravie damaged or tampered with City of Lincoln, Nebraska, property on October 1. It was dismissed in November pursuant to a plea agreement to modify the terms and length of Laravie's original probation in exchange for dismissing the supplemental petition. Laravie was ordered to remain on probation for an additional 6 months, make restitution of $360, and provide 20 hours of community service to the City of Lincoln. On June 30, 2016, an order of satisfactory release and discharge was filed by the juvenile court.

### (b) Exhibit 2

Exhibit 2 contains a juvenile petition filed against Laravie on August 5, 2016, for possession of marijuana, one ounce or less. Laravie pled no contest at the adjudication hearing, and in December, an agreement and order of probation was filed. Laravie was again placed on 6 months' probation subject to numerous terms and conditions. The juvenile court entered an order of release and discharge from probation on June 14, 2017.

### (c) Exhibit 3

Exhibit 3 contains the guidelines for the juvenile diversion program in Lancaster County, Nebraska. As pertinent here, the guidelines indicate that a juvenile charged with a felony offense for possession of a weapon is not eligible for juvenile diversion services.

### (d) Exhibit 4

Exhibit 4 consists of the police reports for the present charges. They indicate that on July 25, 2017, a woman reported her "Michael Kors purse" was stolen from her vehicle. Five days later, she saw it for sale on "Facebook Marketplace," so she alerted the police department. An undercover officer communicated with the seller to purchase the purse and arranged to meet. Laravie drove to the meeting site with a juvenile passenger and met with the undercover officer.

The stolen purse was on the floor by the front passenger seat. Laravie and the passenger were placed under arrest and the vehicle was searched. Two stolen handguns were discovered underneath the passenger seat. One had been stolen on July 5, 2017, from a car parked in a garage; the gun's serial number was defaced. The other gun had been stolen July 16 during a burglary of multiple vehicles located at the home of a law enforcement officer; the serial number on that gun was also defaced.

The juvenile passenger with Laravie admitted to numerous burglaries and thefts and implicated Laravie; he said that he and Laravie found an open garage on July 5, 2017, and they opened a safe and "grabbed guns." The passenger kept one of the 8 to 9 guns they stole, but alleged that Laravie took the others. On the same day at another location, they went into a garage and stole a handgun from the center console of a vehicle there. (This gun was recovered in the vehicle when Laravie and the passenger were arrested.) They stole a purse from another vehicle but later discarded it. The passenger claimed the handgun was always kept in Laravie's car and that Laravie was aware of it.

As for guns stolen from the law enforcement officer's vehicles, the juvenile passenger admitted that he and Laravie stole "guns and gear" after breaking into a car parked in the driveway to obtain the garage door opener to get into the garage. Once in the garage, the passenger got into another vehicle and stole the handgun stored in the center console. (This gun was recovered in the vehicle when Laravie and the passenger were arrested.) The passenger used a coat hanger to unlock the law enforcement officer's "cruiser" parked in the driveway, where more items were stolen, including a rifle. (The rifle was later recovered during the execution of a search warrant at the passenger's residence.) The passenger also admitted to getting an "AK rifle" from Laravie and to stealing the Michael Kors purse and posting it on Facebook Marketplace.

The execution of a search warrant at Laravie's home turned up some ammunition, including two .45-caliber magazines which belonged to the law enforcement officer whose garage and vehicles had been broken into by Laravie and the other juvenile. A women's Prada billfold was seized, and although there were other suspected stolen items present in Laravie's room, none could be traced back to specific incidents.

When Laravie was interviewed by the police, he denied any knowledge of the purse being stolen, as well as denied being involved in any of the burglaries or thefts. Even though he lived in the area where the law enforcement officer lived and whose garage and vehicles had been broken into, Laravie denied ever observing the cruiser or knowing where the law enforcement officer lived.

(e) Exhibit 5

Exhibit 5 contains law enforcement reports related to two juveniles (not Laravie) escaping from the Youth Rehabilitation Treatment Center (YRTC) in Kearney, Nebraska, on August 25, 2017. The vehicle picking up the fleeing youths was subsequently identified as belonging to Laravie's mother. Laravie admitted to picking them up and driving them back to Lincoln, but claimed he was told by one of the escapees that he had been released and needed a ride home. Laravie said that when he arrived and met up with the two youths, he then found out they had escaped from detention. He claimed to have dropped the youths off in Lincoln and that he had no

further contact with them. However, one of the escapees was seen getting into Laravie's car at a shopping mall on August 27, when the escapee had stolen clothing items from a department store. Laravie claimed he arranged to meet his friend at the mall, but he did not know until they were driving away that his friend had stolen clothes from the store.

## 2. TESTIMONY OF SPECIALIZED JUVENILE PROBATION OFFICER

Caleb Skiles, a specialized juvenile probation officer, supervised Laravie on two separate occasions. The first case was on "shoplifting and vandalism referrals," which Skiles took over from the initial probation officer midway through the probation term. Skiles did not recall any problems or sanctions being imposed during the course of his supervision of Laravie's first probation. However, he noted the additional charge that occurred after Laravie was initially put on probation and that a motion to revoke was filed as a result. Skiles' recollection was that, as part of a plea agreement, Laravie was ordered to pay restitution for the vandalism, which he did, and he then successfully completed his probation.

Laravie was never placed out of the home during that probationary period, nor were tracker or electronic monitoring services implemented. Tracker services involve a person meeting the youth at school or home to help with school attendance, homework, or getting a job. Tracker services are implemented when a youth consistently misses school, is having trouble in classes, is getting poor grades, or has too much free time and needs to get involved in extracurricular activities or get a job. Electronic monitoring services are usually put in place when a youth is staying out late past curfew or overnight, or "not coming home for days, hanging out with negative peers." Finally, with regard to the first probationary period, Skiles testified that no specific therapeutic services were offered to Laravie, but it was possible that Laravie had been ordered to cooperate with individual therapy.

The second time Skiles supervised Laravie was approximately 4 to 6 months later when he was on probation for possession of marijuana. During this second period of probation, Skiles recalled Laravie testing positive for "marijuana, benzos, maybe a few others for marijuana after that," and he was sanctioned for the original positive test. He was "[s]anctioned to a substance abuse evaluation," which Laravie completed. It was recommended that Laravie take part in a drug education class and he successfully completed that class. Skiles did not recall any other sanctions or problems during that second probationary period, and once again, no tracker or electronic monitoring services were used. Although the probation order allowed for the use of a tracker, it was not used because Laravie was attending school "for the most part. He had attendance issues here and there, but was pretty consistent, it was mainly his grades." Skiles considered using an electronic monitor as a result of Laravie's mother having concerns about Laravie staying out past curfew or not coming home a couple times over the course of a weekend. Skiles decided to not use the monitor after having a discussion with Laravie and his mother. And although the probation order also provided for Laravie to cooperate with cognitive groups, this was not used because Laravie was in a drug education class. Skiles indicated that when a youth is ordered to participate in certain services through a probation order, it is left to the discretion of the probation officer to set up the services necessary for that youth. Skiles recalled the second probationary period ended "towards the end of May or beginning of June of 2017."

On cross-examination by the State, Skiles was asked to describe the process used when a youth is arrested for certain law violations. Skiles said that law enforcement will call to report a youth on a new law or probation violation, and arrange to meet "whoever's on call" at the "Youth Detention Center here in Lancaster." The probation officer will interview the youth about school, home, past probation terms, and prior law violations; the parents are interviewed with similar questions. Information about the circumstances of the offense are obtained from the law enforcement officer. The purpose of the interviews is to gain information as to whether "the youth is a potential risk to flee or a risk to the community." In making a decision on whether to detain the youth at that time, in addition to considering the information from the interviews and police reports, the probation officer has an assessment tool called "the RAI." According to Skiles, this assessment tool considers

> the law violation itself, if it's a felony or a misdemeanor, prior probation terms, if the youth has been a runaway in the past, has missed court hearings. There's aggravating factors and mitigating factors, if the parent is willing to take them home that evening, or are able to take them and care for them. That will be a mitigating factor as a matter relating to if the kid is not attending school or if they have multiple law violations on the current call.

After assessing Laravie for the present charges, Skiles determined "[s]ecure detention" was needed because of the "severity of the law violation." Skiles acknowledged that certain types of offenses tend to lead to higher scores.

Skiles originally worked as a community-based resource officer, "which is low risk offenders." At the time of this transfer hearing, Skiles had just been "promoted to community base[d] intervention officer, which is the high risk youth[.]" To decide if a youth is a low or high risk offender, a "Youth Level of Service Assessment," (sometimes referred to as "the YLS") is used. According to Skiles, "It determines based on their criminal history, their family circumstances, education, employment, substance abuse, personality behaviors. And then we add all the scores up and if it's over 16, it's a high risk youth, and if it's below that, it's a low risk youth."

The YLS is done by "the predisposition investigation officer, who does the interviewing of the youth and the parent." It is updated every 6 months. Skiles indicated that the juvenile court judge can order therapy as part of a probationary sentence, and this can include substance abuse and mental health therapy, as well as cognitive groups, which are sometimes referred to as moral reconation therapy. Intensive family preservation is also available; it consists of a therapist and a skill builder coming into the home three to four times a week. "[T]he therapist works with usually mental health or substance, and then the skill builder works with the family and the youth to either get them a job, work with the school, attending school, stuff like that." Intensive family preservation is effective for issues going on in the home, and troubles that may be going on with the youth and the youth's parents. The hope is "to preserve the youth in the home . . . prior to being sent out of home." The seriousness of an offense can be considered when deciding whether to maintain a youth in the home.

Out-of-home placements are a "last resort," and can "mean anything between Boys Town, group homes, to treatment facilities . . . or hospitalization treatment facilities." The highest level

of placement for a juvenile is the YRTC, which is used "[i]f we have exhausted all services within the home, and out-of-home placements have all been exhausted as well." According to Skiles, the average length of out-of-home placement is 9 to 12 months. Depending on the group home or placement, that placement usually determines when the youth has successfully completed the program and is ready to return to the community, but there are "team meetings" to make that determination. Once a youth is nearing the end of the out-of-home placement, the probation officer will notify the judge. "In most cases services are put in place to help the youth kind of transition home, coming from a more structured environment to usually a not so structured environment in the home."

Given Laravie's age, which Skiles believed to be 17 at the time of hearing, Skiles acknowledged that it was "[p]ossibly" a concern whether there was time to address Laravie's needs "in such a short amount of time."

### 3. TESTIMONY OF LARAVIE'S MOTHER

Laravie's mother works as a registered nurse at an area hospital; his father is an electrician. In the summer of 2017 (when Laravie engaged in the activity leading up to the present charges), Laravie's mother was working 7 p.m. to 7 a.m. shifts, and his father was gone "weeks at a time for his job." The father subsequently changed jobs so he could be home every day. The mother testified that Laravie was born in April 2000 and was currently a senior at a high school in Lincoln, although he was behind in some credits and would not graduate with his class in May 2018. She said that for the past couple of weeks, her son was involved in an after school club that has boxing, martial arts, and exercise activities. She talked about the rules in her home for Laravie, including curfews. Following an incident where he was not in school as required, Laravie "lost privileges to go anywhere, he lost his car, his phone."

Laravie's mother agreed that Laravie would not turn 19 until April 2019. She did not believe that Laravie "truly understands the significance" of the pending case "[b]ecause of his age" or that he "understood what he was doing and what it could cause in the . . . big picture." "[H]e didn't understand that when you steal guns, they get into hands of other people, and . . . that's how things happen and other crimes are committed and people could die."

Laravie's mother said she was not having any current problems with her son, no behavioral issues, and he was following the established curfews.

### 4. DISTRICT COURT'S ORDER DENYING
### TRANSFER TO JUVENILE COURT

On November 16, 2017, the district court entered an order finding there was a sound basis to retain jurisdiction and therefore the motion to transfer was denied. The court's discussion of the factors contained in Neb. Rev. Stat. § 43-276(1) (Reissue 2016) is set forth in the analysis section of this opinion. Laravie timely appealed from the district court's order.

### III. ASSIGNMENT OF ERROR

Laravie assigns the district court erred by finding the State met its burden of establishing a sound basis for retention of the case in the district court.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. APPELLATE JURISDICTION

When a juvenile seeks to transfer a criminal case from adult court to juvenile court, § 29-1816(3)(c) provides that "[a]n order granting or denying transfer of the case from county or district court to juvenile court shall be considered a final order for the purposes of appeal," and, "[u]pon entry of an order, any party may appeal to the Court of Appeals within ten days." This statutory amendment providing for interlocutory appeals became effective August 24, 2017. On November 22, Laravie properly perfected his appeal from the district court's denial of his motion to transfer his criminal proceeding to the juvenile court.

### 2. MOTION TO TRANSFER TO JUVENILE COURT

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Laravie put him within this category of juvenile offenders.

When Laravie moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a

criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearings and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a) and (b).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

Laravie contends the State failed to meet this burden; therefore, we next consider the district court's discussion of each of the transfer factors and the evidence relied upon in the court's ultimate determination that the factors favored retention over transfer.

3. JUVENILE TRANSFER FACTORS

The district court made findings as to the factors contained in § 43-276(1), which "shall be considered" at a hearing under § 29-1816(3)(a). We first summarize the factors the district court concluded favored retaining jurisdiction, followed by the factors which favored transferring the case to juvenile court, and then the remaining factors which were inapplicable or neutral in this case.

(a) Factors Favoring Retention in District Court

The district court found almost all of the factors set forth in § 43-276(1) favored retaining jurisdiction in the district court, namely: (a) the type of treatment Laravie would most likely be amenable to, (c) motivation for the commission of the offense, (d) Laravie's age, (e) Laravie's previous history, (g) consideration of public safety, (h) Laravie's ability to appreciate the nature and seriousness of his conduct, (i) whether Laravie's best interests and the security of the public may require that Laravie continue in secure detention or under supervision for a period extending beyond his minority and, if so, the available alternatives best suited to this purpose; and (l) whether Laravie has been convicted of or has acknowledged unauthorized use or possession of a firearm.

The district court's order addresses Laravie's past opportunities to work through problems within the juvenile court's jurisdiction, and notes that Laravie "promptly re-offended less than two months after the conclusion of each probation term." And "[d]espite prior juvenile court involvement, [Laravie's] behavior has escalated drastically"; "[j]uvenile alternatives have in fact failed to correct [Laravie's] anti-social behavior"; and therefore, Laravie is "not amenable to the rehabilitative services that can be provided under the Nebraska Juvenile Code."

Regarding Laravie's involvement with stolen firearms, the court stated, "There is no benevolent motive that would explain these actions, and the theft of these firearms poses a risk to public safety." Further, given that Laravie was 17 years old at the time of the pending offenses, and at the time of the transfer hearing he was only "five months from turning 18," the court expressed concerned about the juvenile court losing jurisdiction when Laravie turns 19. The need for "supervision of [Laravie], whether it be incarceration or probation, would extend beyond the time the Juvenile Court would have jurisdiction over [Laravie]."

When considering Laravie's previous history, the court noted Laravie's previous adjudications for theft and marijuana possession, plus the criminal mischief charge which was dismissed in exchange for extending his probation term. As for public safety, the court stated, "The evidence reflects that [Laravie] has a recent history with guns, aiding and abetting escape, and involvement with other individuals engaged in criminal activity. He poses a risk to public safety if he is in the community without intense supervision." The court concluded the need for that supervision would be required beyond the time the juvenile court would have jurisdiction over Laravie.

Regarding Laravie's ability to appreciate the nature and seriousness of his conduct, the court found that Laravie "appears to act without regard for the consequences of his crimes" and does not appear to appreciate "the dangerousness of his crimes and how these actions put the safety and security of the community at risk." And when balancing Laravie's best interests with the security of the public, the court expressed concern that the juvenile court "would have less than 17 months to work with [Laravie] to attempt to supervise and rehabilitate him" and the evidence indicates that Laravie's need for supervision "will outlast his minority[.]"

The factor related to firearms favored retention given Laravie's pending charges, and further, the court pointed out that ammunition stolen from a law enforcement officer was found in Laravie's bedroom.

### (b) Factors Favoring Transfer to Juvenile Court

The district court only found one factor set forth in § 43-276(1) favored transfer to the juvenile court, namely, (b) evidence of violence. The court found there was no direct evidence of violent acts committed by Laravie. However, the court also pointed out that Laravie was involved in multiple thefts "of almost a dozen firearms" and at the time of his arrest, two of those stolen firearms were in his vehicle and had been defaced. Stolen ammunition was also found in Laravie's bedroom.

Although the court stated that § 43-276(1)'s factor (f) related to Laravie's best interests would seem to weigh in favor of transferring because it would be in Laravie's best interest to not have a felony conviction and have the potential ability to seal a juvenile court adjudication in the future, the court also stated that in order to rehabilitate Laravie, it would be in his best interest to be supervised for a period longer than the juvenile court would have jurisdiction.

### (c) Neutral Factors

The district court found three of the factors set forth in § 43-276(1) to be inapplicable, namely: (j) whether the victim agrees to participate in mediation, (k) whether there is a juvenile

pretrial diversion program pursuant to §§ 43-260.02 to 43-260.07, and (m) whether a juvenile court order has been issued for the juvenile pursuant to § 43-2,106.03. Factor (m) is relevant when after a disposition under § 43-247(1), (2), (3)(b), or (4), the court enters an order, after an evidentiary hearing, finding the juvenile is not amenable to rehabilitative services provided under the Nebraska Juvenile Code. Such an order may be considered in a future juvenile transfer motion.

There was no evidence regarding mediation, and although there is a pretrial diversion program in Lancaster County, Laravie would not be eligible given the nature of the current charges. The court found there was no evidence related to factor (m).

Also, with regard to § 43-276(1)'s factor (n) criminal street gang member, this factor was not regarded as being favorable either way. The court acknowledged there was no evidence received on this factor, but that the evidence "does indicate that [Laravie] associates with multiple other individuals who engage in criminal activity."

No additional findings were made under § 43-276(1)'s factor (o), which can be included as to other matters deemed relevant to the decision.

### 4. WAS DENIAL OF TRANSFER ABUSE OF DISCRETION?

As noted earlier, in order to retain the proceedings, a trial court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. See *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015). Further, a trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

In this case, the district court found almost all of the factors set forth in § 43-276(1) favored retaining the case. The only factors the court found in favor of transferring jurisdiction to the juvenile court were: there was no evidence of direct violence committed by Laravie and it was in Laravie's best interests to avoid a felony conviction. Laravie argues on appeal that the district court "abused its discretion by giving a disproportionate amount of weight to [Laravie's] prior juvenile court involvement and the circumstances of the offenses, while failing to give adequate weight to [Laravie's] amenability to treatment, immaturity, and his best interests." Brief for appellant at 7. Laravie claims the State failed to offer any evidence regarding the type of treatment Laravie would be amenable to, nor did it offer evidence as to the length of time necessary to successfully complete such treatment. "The State simply produced [Laravie's] prior probation orders." *Id*. He argues, "[T]here was no evidence presented that indicated [Laravie] would require substantial treatment past the age of nineteen, or that he required treatment and services which could not be provided through juvenile court." *Id*. Laravie contends the evidence demonstrated that he was responsive to the limited interventions and supervision provided by the juvenile court in the past. "Furthermore, finding that [Laravie] would require supervision beyond the time the juvenile court would have jurisdiction and adulthood is pure speculation, especially in the absence of evidence from a qualified professional." *Id*. at 8.

As stated above, there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. Further, as pointed out by the State, "While no expert opined directly on the specific type of treatment Laravie required, . . . the district court did not err

in drawing the inference from Laravie's previous recidivism that the juvenile court's services have been ineffective at rehabilitating him." Brief for appellee at 11. We agree. There is no statutory requirement that an expert testify at these transfer hearings, and further, even if an expert testified and opined that Laravie could successfully be rehabilitated under the juvenile court's jurisdiction before turning 19, the district court would not be bound by such an opinion and could reach its own conclusion on that issue based on the evidence before it. See *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018) (triers of fact are not required to take opinions of experts as binding upon them, and determining the weight to be given expert testimony is uniquely the province of the fact finder). There was ample evidence in this case for the court to determine that Laravie's need for confinement and services would be more safely addressed by retaining the case; this decision is supported by the evidence and is not based on speculation. The evidence established that despite several opportunities to get on a better track under the supervision of the juvenile justice system, Laravie's behavior had instead "escalated drastically." While Laravie may have gone through the required steps of his two prior probations, he clearly was not sufficiently amenable to embracing any lessons learned in a way to better influence his future choices; instead, as the district court observed and the record supports, Laravie's behaviors worsened to "criminal conduct considerably more dangerous than his prior offenses, despite the prior juvenile court involvement."

To reinforce the notion that the juvenile court system had no effect on stopping Laravie's decline into much more serious criminal activity, we point to additional evidence. Laravie went from shoplifting, criminal mischief, and marijuana possession, to burglary, stealing guns, and aiding other juveniles in their escape from detention. The evidence reveals that despite Laravie's ability to complete juvenile probation, within 4 months of his first probation starting, he was charged with a criminal mischief offense. Although that charge was dismissed, it resulted in a 6-month extension of his initial probation. Within a couple months of release from his extended probation in June 2016, Laravie was charged with marijuana possession and was again placed on juvenile probation. And then significantly, within a month of being released from his second probation in June 2017, he is alleged to have engaged in burglary and stealing firearms. In the course of three incidents in July 2017, 11 or 12 firearms were taken, of which only a few were subsequently recovered. And as observed by the district court, "the theft of these firearms poses a risk to public safety."

Laravie contends, however, that being arrested 2 months after completing his second term of probation "goes more to the level of treatment needed, rather than amenability to treatment." Reply brief for appellant at 2. He claims that during his terms of probation, he received "limited treatment services." *Id*. Therefore, there was "no evidence presented to support a finding that [Laravie] would not be amenable to treatment better suited to his rehabilitative needs, but only that the limited past treatment was unhelpful." *Id*. He suggests that "[w]hile the evidence would certainly support a finding that he likely needs a higher *level* of supervision, this does not equate to length of time." *Id*. (emphasis in original). While it is true that the past treatment, which was designed for the lesser offenses committed by Laravie at the time, was apparently "unhelpful" in that Laravie continued to break the law, it is nevertheless also true that despite being subjected to the juvenile court's jurisdiction for 2 years, Laravie demonstrated no behavioral improvement and

instead engaged in more dangerous behaviors. If 2 years were insufficient to reform Laravie's lesser criminal behaviors, then it is certainly understandable why the district court was not persuaded his attitude and behavior could be improved through the juvenile system in the 17 months remaining under the juvenile court's jurisdiction, particularly given the more serious nature of the presently charged offenses.

Further, despite Laravie's parents' attempts to improve their son's behavior through rules, curfews, and lost privileges, and despite Laravie's father changing his job so he could be home every day, Laravie nevertheless made the choice to engage in increasingly dangerous and unlawful activity. The evidence demonstrates that despite parental support and despite juvenile probation services and support, Laravie continued to make bad, in fact, worse, choices. And to the extent Laravie is suggesting treatment and confinement in out-of-home placement or the YRTC are options that should be tried first, that may have been a reasonable option under two circumstances: (1) if more time remained before Laravie ages out of the juvenile court's jurisdiction and (2) if Laravie had not demonstrated disregard for such treatment and confinement by aiding in the escape of others from the YRTC.

Laravie also argues that his need for dual-diagnosis outpatient treatment should be considered. However, as the State correctly notes, although Laravie's mother testified about Laravie completing a mental health and substance abuse evaluation which recommended "[o]utpatient therapy" for "dual diagnosis," the record does not contain any other information on that diagnosis or any proposed course of therapy. Further, to the extent Laravie needs mental health treatment, even his probation officer acknowledged that given Laravie's age it was "[p]ossibly" a concern whether there was time to address Laravie's needs "in such a short amount of time." The district court expressed this same concern repeatedly in its order.

Finally, Laravie argues the court should have more adequately considered his lack of maturity. He argues, "The circumstances surrounding the case certainly do not paint a picture of a sophisticated criminal mind, but rather, a young kid who made poor decisions with a friend." Brief for appellant at 8. However, breaking into people's vehicles or garages to steal guns, purses, and other items is not just a poor decision from the standpoint of knowingly breaking the law, it also demonstrates Laravie's disregard and disrespect for the property, privacy, and personal space of others. Additionally, Laravie and his companion made a deliberate choice to break into a law enforcement vehicle and steal a rifle and other gear; stolen ammunition belonging to that law enforcement officer was located in Laravie's bedroom. The district court's finding with regard to Laravie's ability to appreciate the nature and seriousness of his conduct is on point when stating that Laravie "appears to act without regard for the consequences of his crimes" and does not appear to appreciate "the dangerousness of his crimes and how these actions put the safety and security of the community at risk."

Other cases demonstrate that a district court's decision denying transfer to the juvenile court is not an abuse of discretion when past efforts to rehabilitate a juvenile have not deterred ongoing criminal conduct and the evidence demonstrates genuine concerns for the public's safety if proper supervision and services are not provided. For example, in *State v. Doyle*, 237 Neb 60, 464 N.W.2d 779 (1991), a 15-year-old defendant's failure to observe terms of a prior juvenile probation order, and the fact that the defendant was on probation for burglary when he engaged in

further unlawful conduct provided a sufficient basis for a district court to deny the defendant's request to be transferred to the juvenile court's jurisdiction. See, also, *State v. Doyle*, 237 Neb. 944, 468 N.W.2d 594 (1991) (factual findings of district court set forth after remand). In that case, the defendant and a coperpetrator burglarized a pawn shop, taking guns and ammunition. They subsequently stole a van and went to a shopping mall where the coperpetrator pointed a loaded gun at the victim in an attempt to rob her of her vehicle. In addition to the repeated unlawful conduct despite past interventions, other reasons supporting the denial included concerns about the ability to rehabilitate by age 19, and the facilities for treatment and rehabilitation were better if the case was kept in the district court. The district court's decision was affirmed on appeal.

Also, recently, in *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018), a 15-year-old defendant went on to commit additional armed robberies despite juvenile court intervention and services as a result of prior armed robberies. The defendant's juvenile probation officer claimed the defendant had been "respectful, patient, open, and honest with her." *Id*. at 577, 909 N.W.2d at 368. In that case, the defendant was a gang member and the crimes were premeditated, violent and aggressive. We recognize that Laravie's charges do not indicate any direct violence, nor was there evidence that Laravie belonged to a gang. Nevertheless, there are still concerns as to whether Laravie can be successfully rehabilitated in the time remaining before he reaches the age of majority. In *Hunt*, although it was noted that the defendant might be amenable to treatment, "there were no guarantees 'or even reasonable assurances' that [the defendant] would be accepted into a group home setting given this was his second episode of seriously violent offenses within a 9-month period." *Id*. at 578, 909 N.W.2d at 369. Further, the district court in *Hunt* concluded that without detention and rehabilitative treatment, the defendant presented a serious risk to the community, and it was in the defendant's best interests to be continued in secure detention. After weighing the statutory factors, the district court concluded there was a sound basis for retaining jurisdiction over the case. The Supreme Court affirmed.

In the present case, in addition to the factors discussed previously, when balancing Laravie's best interests with the security of the public, the court expressed concern that the juvenile court "would have less than 17 months to work with [Laravie] to attempt to supervise and rehabilitate him" and the evidence indicates that Laravie's need for supervision "will outlast his minority." Further, the district court found that Laravie "poses a risk to public safety if he is in the community without intense supervision."

We cannot say the district court abused its discretion by finding that the statutory factors favored retaining the case, as the record supports that Laravie's need for supervision and treatment will extend beyond the time the juvenile court would have jurisdiction over him. And when a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. See *State v. Hunt, supra*.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's order denying Laravie's request to transfer jurisdiction of the case to the juvenile court.

AFFIRMED.